Gen. 249]                                                                 249

**LANDLORD AND TENANT**


ELDERLY – OFFICE ON AGING – SECURITY DEPOSITS IN GROUP
SHELTERED HOUSING FOR THE ELDERLY


April 12, 1993


*The Honorable Donald B. Elliott*
*House of Delegates*

You have requested our opinion on two issues related to the payment of security deposits by residents of group sheltered housing for the elderly:

1.    Does §8-203 of the Real Property Article, Maryland Code ("RP" Article) apply to these security deposits?

2.    Assuming that RP §8-203 does not apply because no landlord-tenant relationship exists between the provider of the housing and the elderly resident, may a provider of group sheltered housing for the elderly nevertheless require a security deposit?

For the reasons stated below, we conclude as follows:

1.    Group sheltered housing for the elderly does not involve a landlord-tenant relationship between the provider and the elderly resident.  Because RP §8-203 applies only to security deposits paid to a landlord by a tenant, it does not apply to security deposits required by a provider of group sheltered housing for the elderly.

2.    The absence of a landlord-tenant relationship does not necessarily prevent the provider from requiring a security deposit. Such a deposit is permitted under current regulations if the agreement requiring the deposit is approved by the Office on Aging.

## I

## Introduction

Article 70B, §1(e) of the Maryland Code defines "sheltered housing for the elderly" as follows:

> [A] form of residential environment consisting of independent living assisted by congregate meals, housekeeping and personal services, for:
>
> (1) An individual at least 62 years old who has temporary or periodic difficulty with one or more essential activities of daily living, like feeding, bathing, grooming, dressing, or transferring; and
>
> (2) The spouse of an individual described in paragraph (1) of this subsection who is at least 55 years old and who has temporary or periodic difficulty with one or more essential activities of daily living, such as feeding, bathing, grooming, dressing, or transferring.

Article 70B, §4 grants the Director of the Office on Aging various powers concerning sheltered housing for the elderly. Among other authority, the Director is to develop sheltered housing, §4(b)(1); to make use of federal and State subsidies "to assist low income aged to reside in sheltered housing as an alternative to more costly, but not required, institutional care," §4(b)(2); and to "[a]dopt regulations governing the certification and operation of sheltered housing projects ...." §4(b)(5).

Pursuant to this statutory scheme, the Office on Aging has developed two types of sheltered housing for the elderly: group sheltered housing, also known as group senior assisted housing, and multi-family senior assisted housing. Your inquiry pertains to group sheltered housing only.[1]

---

[1] This opinion is limited to an analysis of the provider-resident

(continued...)

## II

## Regulation of Group Sheltered Housing

"Group sheltered housing" is defined in the regulations of the Office on Aging as "the provision of sheltered housing services and 24-hour on site supervision to 4 to 15 elderly residents in a one-family dwelling unit." COMAR 14.11.07.03(9). "Sheltered housing" is defined as "a form of residential environment that provides independent living assisted by congregate meals, housekeeping, and personal services to elderly persons." COMAR 14.11.07.03(18). A facility for four to fifteen elderly residents may be certified by the Office on Aging to operate sheltered housing provided all applicable local requirements have been satisfied, such as zoning, housing, life safety, and health codes. COMAR 14.11.07.05 and .11. Facilities so certified are exempt from the licensing requirements of the Department of Health and Mental Hygiene, which would otherwise be applicable to providers of this type of "domiciliary care." *See* §19-301(l)(2)(iii) of this Health-General Article ("HG" Article). *See also* COMAR 14.11.07.02.[2]

Sheltered housing includes, but is not limited to, the following minimum elements: shelter; meal service; personal services, like assistance with bathing, grooming, laundry, and housekeeping; and 24-hour on site supervision. COMAR 14.11.07.20.

In order to be eligible for group sheltered housing services, an individual must be 62 years old. The individual also must be physically or mentally impaired, in need of support services, and in

---

[1] (...continued)
relationship and the application of security deposits in group sheltered housing. We do not address the multi-family sheltered housing program, also administered by the Office on Aging.

[2] Under HG §19-301(d)(1), "'[d]omiciliary care' means services that are provided to aged or disabled individuals in a protective, institutional or home-type environment." Domiciliary care facilities generally fall within the definition of "related institution." HG §19-301(l)(1)(i). Exceptions other than sheltered housing for the elderly are set out in HG §19-302(a).

need of temporary or periodic assistance with activities of daily living. COMAR 14.11.07.21A.

The regulations contain specific requirements for the physical plant of a facility, qualifications of the provider or manager, and staffing requirements. COMAR 14.11.07.12 through 14. Other requirements pertain to resident rights, resident funds, and the provider-resident agreement. COMAR 14.11.07.15 through 18. Many of the provisions of these regulations are analogous to the domiciliary care regulations of the Department of Health and Mental Hygiene. *See* COMAR 10.07.03. In addition, the resident rights provision in COMAR 14.11.07.15 is analogous to the requirements of HG §19-344, often referred to as the "nursing home patient's bill of rights." The resident funds provision in COMAR 14.11.07.16 is also analogous to the requirements of HG §19-346.

The regulations delineate certain details of the relationship between provider and resident. That is, the provider-resident agreement must contain the following provisions, among others: the amount of the monthly fee for shelter and services; the amount of payment to be paid by the resident; the amount of subsidy, if any; a list of the services provided; and the time period of the agreement, including beginning and ending dates, and, of special pertinence to your inquiry, "the amount and purpose of any fees in addition to the monthly fee." COMAR 14.11.07.17D. Any other terms agreed to by the provider and the resident must be approved by the Office on Aging. COMAR 14.11.07.17.D(8).

Other provisions protect the elderly resident with regard to termination of the agreement. A provider may only terminate the agreement with a resident for the following reasons: a change in the resident's health requiring a higher level of care and services than the provider is authorized to provide; behavior by the resident constituting a substantial threat to the resident or to other residents; and nonpayment of fees by the resident. COMAR 14.11.07.18. These provisions are analogous to HG §19-345, which governs the transfer or discharge of a nursing home resident. A resident of a group sheltered housing facility may terminate a provider-resident agreement for any reason upon 30 days written notice to the provider. COMAR 14.11.07.18 E.

### III

### Security Deposit Law

RP §8-203(a) defines a "security deposit" as "any payment of money, including payment of the last month's rent in advance of the time it is due, given to a landlord by a tenant in order to protect the landlord against nonpayment of rent or damage to the leased premises." The statute imposes a cap "of two months' rent, or $50, whichever is greater, per dwelling unit, regardless of the number of tenants." RP §8-203(b)(a). A tenant who is charged a security deposit greater than the maximum is afforded a treble-damages right of action that "may be brought at any time during the tenancy or within two years after its termination."[3] No provision of RP §8-203 "may be waived in any lease." RP §8-203(j). The statutory definitions of the pertinent terms are not illuminating. A "landlord" is defined as "any landlord"; a "tenant," as "any tenant." RP §1-101(g) and (m). A "lease" is "any oral or written agreement, express or implied, creating a landlord and tenant relationship ...." RP §1-101(h).

Thus, RP §8-203 would apply to group sheltered housing for the elderly only if the provider is a "landlord," the resident is a "tenant," and the relationship between the two is a "landlord and tenant relationship" created by a "lease."

In 60 *Opinions of the Attorney General* 425 (1975), the Attorney General was asked whether RP §8-203 applied to security deposits collected from dormitory residents at State colleges and universities. Concluding that the statute did not apply, the Attorney General examined "the terms and conditions of the acceptance of students for residence" and concluded that they were "generally inconsistent with the commonly understood relationship of landlord and tenant." 60 *Opinions of the Attorney General* at 427. The Attorney General pointed out that rooms were assigned by the college, the occupants did not select their fellow occupants as a matter of right, and residents used common facilities such as

---

[3] Other provisions of RP §8-203 regulate such matters as receipts, the accounts in which security deposits are held by the landlord, the payment of interest when the deposit is returned, and the circumstances under which a security deposit may be withheld.

bathrooms and lounges and were furnished services such as maid service and trash removal. "These incidents of college residence run counter to the exclusive possession of premises ordinarily implicit in a landlord-tenant relationship," the Attorney General concluded. *Accord, Houla v. Adams State College,* 190 Colo. 406, 547 P.2d 926 (1976); *Englehart v. Serena*, 318 Mo. 263, 300 S.W. 268 (1927).

We reach the same conclusion about group sheltered housing for the elderly. Group sheltered housing is designed to provide specific services to an elderly resident in need of temporary or periodic assistance with activities of daily living. COMAR 14.11.07.21A. In a group sheltered housing facility, the elderly resident is assigned an available room. COMAR 14.11.07.12.I. Specific required services are furnished to the elderly resident. COMAR 14.11.07.20. A provider may terminate the provider-resident agreement with a resident only for specific limited reasons; a resident may terminate for any reason. COMAR 14.11.07.18. All of the residents use common facilities such as bathrooms, family rooms, and dining rooms. The elderly resident does not have exclusive possession of any part of the group sheltered housing facility.

In short, group sheltered housing facilities, like domiciliary care facilities, are not boarding houses but instead are licensed or certified facilities required to provide specific services and care to vulnerable persons. Applying the reasoning of 60 *Opinions of the Attorney General* 425, we conclude that a landlord-tenant relationship does not exist between the provider of a group sheltered housing facility and an elderly resident. Accordingly, RP §8-203 does not apply to a security deposit charged to a resident of such a facility.

## IV

### Security Deposits in Group Sheltered Housing

Nothing in the group sheltered housing regulations prohibits a provider from requiring a deposit from the elderly resident. Indeed, the regulations specifically recognize that a provider might charge fees of various kinds. The provider is required to disclose in the provider-resident agreement the "amount and purpose of any fees which are in addition to the monthly fee." COMAR

14.11.07.17D(4). A security deposit would be one such additional fee.

The terms of a provider-resident agreement, including any "security deposit," if that is what a provider labels such an additional fee, are subject to the prior approval of the Office on Aging. COMAR 14.11.07.17B. Presumably, the Office on Aging could withhold approval from a contract that sets an unreasonably high deposit.[4] The Office on Aging could also require language in a contract similar to RP §8-203 to protect the resident's deposit. And, of course, the Office is free to amend its regulations to address concerns about security deposits.[5]

## V

### Conclusion

In summary, it is our opinion that:

1.     RP §8-203 does not apply to the deposits made by elderly residents to providers of group sheltered housing.

2.     Providers of group sheltered housing are not prohibited from requiring deposits by elderly residents. The amount of the

---

[4] You have expressed concern that some providers are charging elderly residents as much as $1500 as a security deposit. Even if RP §8-203 were applicable, however, it would allow a security deposit of up to two months rent. According to Office on Aging records, providers are charging between $700 and $3000 per month for their services; the average is between $1200 and $1600. Thus, in most instances, a $1500 security deposit would be lawful under RP §8-203 (if the resident's monthly fee were deemed "rent").

[5] We also note that under Article 70B, §8(3), the Director of the Office on Aging has authority to regulate continuing care communities. As the Office construes its regulation, a provider of sheltered housing that charged a "security deposit" greater than three times the weighted monthly average fee of the facility might be deemed to have charged a continuing care "entrance fee," triggering the regulatory scheme for continuing care facilities. Such facilities are also not subject to RP §8-203. *See* Article 70B, §23.

deposits and other provisions regarding the deposits are governed by Office on Aging regulations. If these provisions are thought to be inadequate in preventing unusually high deposits or in protecting resident funds, the regulations can be amended.

J. Joseph Curran Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*

Rachel E. Pappafotis
*Assistant Attorney General*